UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:10-CV-2882-PAG |
| v. | ) ) | Judge Patricia A. Gaughan |
| KAPLAN HIGHER EDUCATION CORPORATION, et al., | ) ) ) | |
| Defendants. | ) ) ) | |

## EEOC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

In this lawsuit, EEOC alleges that Defendant's use of credit history in the hiring process violates Title VII because it has a disparate impact on African Americans.  Defendant asserts as an affirmative defense that its use of credit history is job related and consistent with business necessity. Doc #15:6; Doc #59:9-10.  EEOC is entitled to summary judgment on that affirmative defense.

Pursuant to Supreme Court precedent, an employer cannot satisfy the "job related and consistent with business necessity" affirmative defense in a disparate impact case unless it proves: (1) that the selection criterion the employer uses is job related; and (2) that the employer's use of the selection criterion is consistent with business necessity.  Defendant asserts that its use of credit history is job related because negative information found on someone's credit report predicts whether that person is likely to commit fraud.  However, Defendant has produced no evidence linking negative credit history information and propensity to commit fraud.  Additionally, and even if Defendant could satisfy the "job relatedness" prong of its affirmative defense, the law also requires Defendant to prove the second prong – that the use of credit history information is necessary to

1

satisfy Defendant's important business needs.  Defendant has produced no evidence to satisfy the second prong.  Accordingly, EEOC is entitled to summary judgment on the affirmative defense.

## STATEMENT OF FACTS

In 2004, Defendant began using credit history information in its hiring process.  Seelye Dep 23:15-17.  According to Defendant, credit checks are required for any position related to finance – ranging from bookkeeper, to student loan counselor, to financial aid assistant.  Ex. 3 to Seelye Dep; Ex. 2 to Rogoff Dep @ DEF000630; Rogoff Dep 72:19-25; 73:2-25.  Defendant conducts credit checks for any position that is "in any […] way capable of substantially influencing the company's financial outcomes."  Ex. 3 to Seelye Dep.  The following is an excerpt from Defendant's credit check policy providing an illustrative, but not exhaustive, list of credit-checked positions:

> **Credit Report:**  Credit reports are required for all Accounting/Finance and Financial Aid employees, or any other position handling cash or cash equivalents or in any other way capable of substantially influencing the company's financial outcomes.  Such employees include but are not limited to the following positions:
> **A) Campus-based and Field** – Presidents, Executive Directors, Director of Finance, Business Office Manager, Bookkeeper, Bookstore Manager, Evening Campus Manager or Coordinator, Director of Financial Aid, Financial Aid Officer, Financial Aid Advisor, Group Controller, Group or Regional Director of Financial Aid;
> **B) Home Office or on-line businesses** – Executives (Vice Presidents or higher), Controller, Assistant Controller, Director of Finance, Director of Financial Aid, Financial Aid Officer, Financial Aid Advisor,

Ex. 3 to Seelye Dep.  Defendant conducts credit checks and makes hiring decisions based on applicants' credit reports before the applicant begins working for Defendant.  Rogoff Dep 120:5-16. If a current employee seeks a transfer or promotion to a position for which Defendant requires a credit check, then the employee must pass the credit check before moving to that position.  Similarly, an employee whose credit history was not assessed before the employee began working in a credit-checked position must pass the credit check before he or she can continue working in that position.[1]

---

[1]     In April 2009, Defendant discovered that some current employees working in credit-checked positions had "problematic" credit histories.  Bouchard Dep 12:4-25; 13:1-11.  Those employees were given a certain number of days to show that they had fixed the credit problems.  Id., 12:16-18.  Employees whose credit reports reflected "lower risk" were given more time to correct the problems than those whose reports reflected "higher risk."  Id., 13:4-11.  Letters may have

## DEFENDANT'S CREDIT CHECK CRITERIA AND USE OF VENDORS

Defendant assesses an applicant's[2] credit report during one of two credit screens.  The first credit screen is conducted by a vendor hired to perform background checks.   Seelye Dep 111:8-20. Defendant has developed the following list of bullet-point credit check criteria, which its vendors use to screen applicants' credit reports:

An applicant is considered a <u>high risk</u> in regards to their [sic] credit history provided that any outstanding or past due amount reported is equal to or higher than the below established criteria:

- Overdue child support payments totaling $2,000 or more;

- Any current garnishments on earnings;

- Outstanding civil judgments totaling $2,000 or more;

- Any individual or combined past due balances totaling $2,000 or more;

- Outstanding individual or combined tax liens totaling $2,000 or more;

- Aggregate of $1,000 charged off within the preceding one (1) year period or aggregate of $2,500 charged off within the last five (5) years.

Ex. 4 to Seelye Dep; Seelye Dep 66:5-14; 90:19-24; 54:4-18.[3]  Additionally, if the applicant has no established credit ("no credit") or a bankruptcy, the applicant is considered a "high risk."  Exhibit 4 to Seelye Dep; Rogoff Dep 69:24-25; 70:1-6.  If the vendor applies the credit check criteria and, as a result, the applicant "Passes," the vendor automatically generates an e-mail to Defendant indicating that the applicant is eligible for hire.  Ex. 3 to Seelye Dep; Seelye Dep 50:4-23; Rogoff Dep 110:5-

---

been sent to employees who needed to correct the problems.  Id., 19:1-12.  If the employees did not correct the financial issues, they were terminated.  Id., 15:19-25; 16:1-4.  Letters were not sent to *applicants* whose credit reports were problematic – only to current employees identified during the April 2009 review.  Id., 19:13-23.   Charging Party Shandria Nichols, one of the employees whose purported credit problems were flagged after she was hired, was fired based on her credit report.  Nichols Dep 201:18-25; 202:1-25; 203:1-2.

[2]    In this motion EEOC refers to applicants and employees collectively as "applicants" unless otherwise specified.

[3]    Although the vendors' grading results included a section entitled "Personal Debt Ratio," that portion is marked "Not Applicable."  Defendant's credit raters, the controllers, did not consider "personal debt ratio" when assessing credit reports.  Rogoff Dep 121:25; 122:1-14; Corser Dep 108:18-23.  Neither controller sees the applicants' income levels.  Id.

12.  If the vendor applies the credit check criteria and the applicant does not "Pass," the applicant is rated as "Review" and the vendor sends Defendant the applicant's credit report for assessment. Seelye Dep 54:4-18; 61:25; 62:1-6.

Defendant developed the bullet-point credit check criteria based on the company's assumption that applicants whose credit reports reflect any of the criteria are "high risk" because they are under "financial stress."  Seelye Dep 66-70; 110:10-12 ("The criteria were developed specifically to give an indication of financial stress.").  According to CFO Seelye, who testified as Defendant's 30(b)(6) designee on its "job related and business necessity" affirmative defense, the criteria were developed based solely on the company's "judgment."  Id., 66:15-25; 67:1-11; 67:12-22; 68:1-5; 69:1-25; 70:1-5.  Defendant's criteria were not credentialed by anyone outside of the company and were not approved by any organization.  Id., 108:20-25; 109:3.  Defendant did not consider whether any of the criteria might unfairly impact any particular group.  Id., 111:4-7.

### DEFENDANT'S CREDIT RATERS SCREEN APPLICANTS RATED AS "REVIEW"

Once the applicant is rated as "Review," the vendor sends an e-mail with the applicant's credit report to Defendant.  The vendor's e-mail and embedded credit report are forwarded to Defendant's "controller," who recommends for or against hire based on the credit report.  Id., 62:5-12.  During the relevant period, two controllers have assessed credit reports – Kevin Corser (2005 to 2009) and Howard Rogoff (2009 to the present).  Corser Dep 8:6-16; 10:7-16; 11:4-125; 12:1-25; 13:1-3; 13:24-25; 14:1-25; 15:1-8; 52:1-14; 73:15-25; Rogoff Dep 18:20-23; 22:21-23; 38:6-25.  The controller opens the e-mail, reviews the credit report, and uses his subjective "judgment" to evaluate the credit report and recommend whether the applicant should be hired.  Seelye Dep 61:15-24; 62:7-16; Rogoff Dep 41:3-25; 42:1-14; 38:6-25; Corser Dep 36:24-25; 37:1-7; 37:25; 38:1-25; 39:1-22; 41:1-13.  Then the controller advises Defendant whether he recommends for or against hire based on the applicant's credit report.  Id.  For those seeking employment in the Kaplan University (KU)

4

group, the controller's recommendation is not reviewed by anyone and is final; as controller Rogoff testified, for the KU credit report hiring recommendations "[t]here is no review or appeal process." Rogoff Dep 46:7-24; 47:8-12; 56-57. Similarly, if the controller recommends that an applicant rated as "Review" should be hired (anywhere in the company), there is no internal review of that decision. Id., 56:20-25; 57:1-2. For those seeking employment in the Kaplan Higher Education Campus (KHEC) group, the group vice president has the ability to override the controller's negative recommendation. Id., 56-57.

Defendant's controllers testified that they assessed applicants' credit reports using their own "judgment." Rogoff Dep 36:7-15; 37:1-18; 38:6-25; Corser Dep 108:24-25; 109:1-20.[4] Each controller considered different factors and weighed factors differently. No cut-off score, or other quantifiable standard, was used. Rogoff Dep 50:20-25; 51:1-12. Rogoff testified that he used Defendant's bullet-point credit check criteria "as a guide" and then applied his "judgment" to conduct a "holistic review." Id. 36:7-15; 37:1-18; 38:6-25. When asked to define "holistic," Rogoff testified that he "did not necessarily look at one specific criteria" but "looked at many factors other than simply the criteria which caused the report to be reviewed in the first place." Id. By contrast, Corser testified that he had never seen Defendant's bullet-point credit check criteria before his 2012 deposition. Ex. 4 to Corser Dep; Corser Dep 69:11-25; 70:1-10. Further, Corser testified that he used *no criteria* or documented standards to evaluate the credit reports, including evaluating: the number of accounts and dollar amounts of charge-offs; the amount of money in collections; and past history of problems with loans. Corser Dep 64:10-19; 74:8-14. Instead, Corser testified that he evaluated the credit reports "holistically" and looked at "the preponderance of the information" in the credit report. Id., 64:19-25. Defendant provided no formal training to Rogoff or Corser concerning

---

[4]     Although Corser repeatedly characterized his judgment as "professional," he had no experience reviewing credit reports before he began doing so for Defendant in 2005. Corser Dep 110:16-25; 111:1-19.

the assessment of credit reports.   Corser Dep 33:5-25; 34:2-9; 35:1-19; 36:8-13; 41:25; 42:1-6; Rogoff Dep 34:7-25; 25:1-25.   Seelye simply told Corser about how Seelye thought credit reports should be assessed.  Corser Dep 41:45; 42:1-4.  No training materials were used.  Id.  Rogoff could not recall any training or discussions about how he should assess credit reports other than reading the bullet-point credit check criteria.  Rogoff Dep 34:7-25; 35:1-25.

Both controllers testified that they reviewed nothing more than the applicants' credit reports when making hiring recommendations.   Corser Dep 37:14-17; 65:2-5; Rogoff Dep 37:12-18. However, the credit reports that the controllers reviewed did not provide the information that the controllers claimed formed the basis for their "judgment."   For example, Rogoff testified that he placed more emphasis on delinquent "discretionary" items such as "book clubs" and "video memberships" that showed up in the applicant's credit report as opposed to delinquent mortgage payments and car payments.  Rogoff Dep 98: 6-21.  As support for his reliance on "discretionary" items, Rogoff supplied only his personal belief that a credit report reflecting delinquent "discretionary" items shows that an applicant is "high risk."  Id., 98:14-25; 99:1 ("If [the applicants] knowingly have no money to pay for their book club or their Blockbuster membership, that they are knowingly making that decision, and, therefore, that would create a higher risk.").  However, Rogoff could not have known, based on the credit reports he reviewed, whether the applicant did or did not "have money to pay" for the discretionary items or whether the applicant "knowingly [made a] decision" not to pay a purported debt.   Rogoff admitted that he did not consider an applicant's "personal debt ratio" and never sees the applicants' income levels.   Rogoff Dep 121:25; 122:1-3. Additionally, nothing in the credit reports that Rogoff reviewed, several of which he identified during his deposition, indicate whether the applicant did, or did not, have money to pay any reportedly delinquent item.  Id.   Therefore, the credit reports Rogoff reviewed could not have informed Defendant whether, as Rogoff put it, the applicant "*knowingly* had no money to pay."  Id., emphasis

6

added. Rogoff also conceded that some credit reports do not even include sufficient detail to determine whether expenditures are "discretionary." Id., 133:13-25. And Rogoff did not use any process to request further information about the applicant's credit history – beyond reading the credit report – before making his final decision. Id., 49:20-24. In fact, Rogoff has never sought more information about the applicant's credit history when conducting his credit report reviews. Id., 49:25; 50:3-19.

Similarly, Corser testified that he used his own "judgment" to determine whether applicants had "financial pressures" that would tempt them to steal from Defendant. Corser Dep 82:20-25; 83:1-13 ("[I]n general, the person would have financial pressures, which could create a risk on them, feeling pressure or temptation to take money from our company."). Like Rogoff, Corser reviewed only the credit report and no other information about the applicant. Id., 37:14-17; 65:2-5. However, Corser could not recall anything in the credit reports that listed fraud or thefts. Id., 82:12-14; 82:23-25; 83:1-2. Moreover, Corser admitted that he did not know the applicants' income-to-debt ratio when he reviewed credit reports. Id., 108:18-23. Corser offered no explanation for how he could determine an applicant's "financial pressure" without information about what assets or income the applicant had to satisfy his or her debts. Corser used no ratio or computation to determine the level of financial stress depicted in a credit report. Id., 108: 24-25; 109:1-5. When asked what standard he used to measure the amount of financial stress that would motivate an applicant to commit fraud or steal, Corser simply replied: "I looked at the overall [credit] report." Id., 83:19-22. When asked whether anything in a credit report reflects acts of dishonesty, Corser answered: "Nothing apparent." Id., 82:15-19. Corser admitted that he had no way of knowing whether the applicant's purported failure to pay a debt was beyond the applicant's control. Id., 77:25; 78:1-18.

From November of 2011 to the present, Defendant's CFO Jerry Dervin has also assessed credit reports for applicants seeking positions in the KHEC group who were rated as "Review."

Dervin Dep 8:12-15; 11:3-10; 14:17-25; 15:1; 34:10-15; 35:19-21; 41:3-7.  As distinguished from the controllers' recommendations for KHEC positions, Dervin's negative credit report decisions are not subject to review or override.  Id., 63:10-15; 74:11-17.  Like the controllers, Dervin relied on his own subjective judgment to assess credit reports.  Id., 37:1-20.  Dervin made no attempt to reduce Defendant's credit check criteria to any set of standards, quantifiable elements, or measurable process; instead, Dervin readily admitted that Defendant's method of assessing credit reports (including both his and Rogoff's application of that method) is "*more of an art* than it is a clear-cut science." Id., emphasis added.  Dervin received no training on how to assess credit reports other than talking to Rogoff and, possibly, receiving an e-mail from human resources.  Id., 62:5-25; 63:1-8.  Like Corser, Dervin had never seen Defendant's bullet-point credit check criteria, and didn't know what those criteria were, before his 2012 deposition.  Id. 36:1-16; 57:21-22; Ex. 5 to Dervin Dep.

For those seeking positions in the KHEC group, the group vice president has discretion to override the controller's negative recommendation.  Rogoff Dep 56-57.  As noted above, Dervin's KHEC credit report recommendations are not subject to review or override.  Dervin Dep 63:10-15; 74:11-17.  In a 30(b)(6) deposition, EEOC asked Defendant to identify all instances when a controller's credit report recommendation was overridden.  Ex. 1 to Calfee Dep.  Defendant produced a spreadsheet that identified only 24 total overrides over a six year period, or an average of only four per year.  Ex. 3 to Calfee Dep.  The spreadsheet identifying the 24 overrides includes the reasons why the controller's recommendations were overriden.  Id.  The reasons given for the overrides are contradictory and, in some instances, rebut Defendant's assertion that credit checks are necessary for all finance related positions.  For example, according to the spreadsheet, group vice president Stephenson excused allegedly poor credit because, although the applicant sought a finance position, the job at issue was non-management.  Id., p. 1 (re: J.S., R.B., and S.L. for Financial Aid Officer); p. 2 (re: D.A. and M.F. for Financial Aid Advisor and L.B. for Bookkeeper).  By contrast, Stephenson

approved several applicants for hire into Director or other management positions notwithstanding the applicant's allegedly poor credit.  Id., p. 1 (approving R.S. for Finance Director notwithstanding $49,000 in "charge offs," two accounts in collections totaling approximately $13,000, $25,000 in past due balances, and tax lien of $2,000,); p. 2 (approving J.W. for Director of Development Programs/DDP notwithstanding "[v]ery large credit card write-off's within the past 5 years."); p. 2 (approving J.H., R.B., and W.P. for Finance Director, Executive Director, and Business Officer Manager).

## DEFENDANT TOOK NO STEPS TO ENSURE THE ACCURACY OF CREDIT REPORTS

Although Defendant conceded that credit reports often contain errors, Defendant made hiring decisions based on credit reports without taking any steps to determine whether the credit history information found in the reports was accurate.  Defendant's CFO Seelye conceded that credit reports may contain inaccurate or erroneous information.  Seelye Dep 65:15-17.  CFO Dervin also conceded that credit reports contain inaccurate information.  Dervin Dep 26:9-23.  In fact, when Dervin discovered inaccurate information in his own credit report, he "filed for a correction" but the inaccuracy was never corrected.  Id.  Nevertheless, when reviewing applicants' credit reports, Dervin takes no steps to ensure the report is correct and simply "assume[s] it is accurate."  Id., 63:19-25; 64:1-12.  When asked why he assumes that credit reports are correct Dervin answered, "I'm not sure why I would assume they're accurate."  Id., 64:10-12.  When asked what standard he uses to assess whether the credit report is correct, controller Rogoff testified that he simply "believes" that the information in the credit report is accurate.  Rogoff Dep 51:13-17.  Similarly, Corser testified that Defendant does not test the accuracy of credit reports.  Corser Dep 66:22-24; 67:1.

Rogoff maintained a long-term practice of sticking to his negative credit report recommendation unless the applicant could prove that his or her credit report was inaccurate.[5] For example, in 2011 applicant Jane Doe[6] applied to work for Defendant as a Director of Development Programs (DDP).  At the time she applied, Doe was working for a large global insurance provider as a Financial Planner.  DEF001453; DEF001455.  Doe anticipated that her credit history might be an issue when she applied to work for Defendant.  On January 28, 2011, Doe wrote to Defendant and explained that she believed that her credit check may be flagged.  DEF004720.  In her letter to Defendant, Doe explained that she began experiencing financial difficulties in 2001 due to her mother's cancer diagnosis, her mother's death, and her husband's loss of employment.  DEF004721-004723.  The letter documents the obstacles Doe overcame to continue providing for her family's financial needs during several years of hardship.  Id.  Doe also provided alternate sources to verify her trustworthiness such as: the background and credit check that her current employer conducted in 2008; her favorable history as a Financial Planner as tracked by two regulatory authorities (the Financial Industry Regulatory Authority and the SEC's Investment Adviser Public Disclosure Program); and the lack of investigations or claims made against her liability insurance policy.  Id.  On February 7, 2011, Rogoff reviewed Doe's credit report and concluded: "Not recommended for hire. Many collection items and write-off's."  Ex. 6 to Calfee Dep.  On February 8th, Rogoff's recommendation against hiring Doe was forwarded to a group vice president.  Id.  In response, the group vice president sent Doe's January 28th letter to Rogoff.  Id.  Rogoff read Doe's letter, but replied that he would not change his negative recommendation.  Id.  Specifically, Rogoff stated:

---

[5]     Rogoff set the bar exceedingly high for proving that information in the report is incorrect.  Specifically, he testified that he "would consider accepting" from an applicant "*something signed by the credit reporting agency* that a specific item or items were inaccurate" as part of his review.  Rogoff Dep 51:17-23, emphasis added.

[6]     EEOC will file a motion to submit the Jane Doe exhibits under seal to protect her privacy.

I have reviewed the documentation provide[d] by [Jane Doe] and while I am certainly sympathetic to [Jane Doe's] family situation, and her mother's illness, I do not believe that this information would change my recommendation. *I have long taken the stance that we would only consider changing a recommendation if the information contained in one's credit report is incorrect.* I don't believe that [Jane Doe] is disputing the negative items on her report, but rather, simply attempting to provide an explanation as to how she is where she is. That said, I will have to maintain my recommendation as not to hire.

Id., emphasis added.  The group vice president responded that he wanted Rogoff to tell him whether Jane Doe's explanation "matched her report."  DEF004986.  Rogoff responded that, yes, her explanation generally "matched her credit report."  Id.  Nevertheless, there is no evidence that Rogoff changed his recommendation against hiring Doe.[7]

## DEFENDANT'S CONTROLLER RECOMMENDED LESS RESTRICTIVE CRITERIA

Rogoff disagreed that the credit criteria Defendant uses are necessary to the selection process. According to Rogoff, he recommended in March 2010 that Defendant "loosen" its credit check criteria because an applicant's poor credit history may simply reflect the applicant's struggle to cope with a declining economy and may not show that the applicant is a "high risk."  Ex. 2 to Rogoff Dep; Rogoff Dep 72:19-25; 73:2-25; 86:6-18; 83:7-12; 82:18-24; 82:2-8 ("[T]he economy was going through a recession at the time [...] individuals might be struggling through that recession through no fault of their own, and, therefore, as a result of that didn't in and of itself for those reasons present a high risk individually.").  Although Rogoff recommended relaxed credit check criteria to allow for situations where an applicant's credit history was poor "through no fault of their own," he continued to rely on credit reports to assess applicants even though "*there is no way to tell on the surface of a credit report whether a specific delinquency was [...] at fault or not at fault.*"  Rogoff Dep 82:2-8; 82:15-17, emphasis added.  Rogoff also recommended using a FICO score "to make the review somewhat more objective."  Id., 99:13-19.  Rogoff presented his recommendation that Defendant

---

[7]     EEOC searched the employee database Defendant produced but could find no evidence of Jane Doe's hire.

"ease" its credit check criteria directly to Defendant's CFO Lionel Lenz so that Lenz could decide whether to make a change in the process.  Id. 77:20-25; 78:1-25; 74:7-15; 85:17-21.   No decisions came out of Rogoff's meeting with Lenz and Lenz had no other discussions with Rogoff about his recommendations.  Id. 87:1-9; 101:24-25; 102:1-4.    There is no evidence that Defendant relaxed its standards following Rogoff's recommendation or employed any objective or quantifiable credit check criteria.  Nevertheless, and because Rogoff believed that the credit criteria should be "eased," Rogoff began applying yet another set of credit criteria to the reports he evaluated.  Id.  For example, in the reports he personally assessed Rogoff changed the credit check criteria flagging past due balances of at least $2,000 and 60 days old to $5,000 and 90 days old; Rogoff also eased the tax lien standards he applied.  Id., 93:11-15; 93:19-25; 20:1-6.

Additionally, Rogoff recommended that Defendant stop reviewing full credit history for applicants seeking financial aid assistant and student loan counselor positions.  Ex. 2 to Rogoff Dep @ DEF000630; Rogoff Dep 72:19-25; 73:2-25.  Specifically, Rogoff advised Defendant that it is only necessary to determine whether applicants for such positions have defaulted on a student loan – not to assess their full credit history.  Id.  Nevertheless, Defendant still requires review of the full credit report for financial aid assistants and student loan counselors.  Id., 111:8-25; 112:1-4.  Other record evidence also suggests that it was not necessary for Defendant to screen applicants for certain positions based on their entire credit histories.  For example, in October of 2009 human resources manager Bill Van Patten forwarded to another human resources manager an e-mail Van Patten wrote advising that in the "financial aid area – [Defendant] hire[s] folks into positions which don't require a full credit history, but do require checking only for defaulted student loans."  Ex. 1 to Van Patten Dep; Van Patten Dep 34:6-25; 35:20-25; 38:10-25; 39:1-6.  According to Van Patten, for the positions at issue Defendant didn't need to assess the full credit report.  Van Patten Dep 40:4-14.  For those positions, Defendant needed only to determine whether the applicant was "in default on a

12

student loan," and didn't need to screen based on "full credit history." Id., 41:4-21. Notwithstanding Van Patten's e-mail, there is no record evidence that Defendant has ever limited its credit check for any position to a review of student loan default information.

### DEFENDANT'S CONTENTION THAT NEGATIVE CREDIT HISTORY PREDICTS FINANCIAL STRESS AND PROPENSITY TO COMMIT FRAUD

According to CFO Seelye, who testified as Defendant's 30(b)(6) designee on its affirmative defense, the review of credit reports was a "control activity" intended to prevent employees holding certain positions from engaging in fraud. Ex. 1 to Seelye Dep; Seelye Dep 24:1-19. Specifically, "the adjudication of the applicant's credit" is done to prevent fraud, generally, and fraud in the administration of financial aid rules and regulations. Id., 24:20-25. However, Seelye conceded that there are no financial aid rules and regulations that require Defendant to obtain credit history information for an applicant seeking employment in credit-checked positions. Id., 25:2-6. Defendant's justification for relying on credit history information in the selection process is based on the following two assumptions: (1) that information found in someone's credit report indicates whether that person is under "financial stress" Seeyle Dep 14:15-19; and (2) that if a person is under "financial stress" that person is more likely to engage in fraud or other financial misconduct. Id., 24:20-23. The controllers echoed Seelye's testimony, insisting that someone who has poor credit history is under financial stress and, therefore, more likely to steal money from Defendant or engage in fraud. Corser Dep 82:20-25; 83:1-13; Rogoff Dep 39:18-25; 40:1-9.

EEOC asked Defendant to identify evidence proving that negative information on someone's credit report shows that the person is under "financial stress" or predicts whether the person will engage in fraud. Defendant produced no such evidence. Seelye conceded that he is not aware of any "measurable frequency of fraudulent activities" for the positions at issue and he could not determine whether conducting credit checks on applicants actually decreased fraud. Seeyle Dep 37:22-25; 38:1-

13

9.  Additionally, Seelye conceded that Defendant has no documents to support its assumption that the credit check criteria it uses bear any relationship to whether an applicant will be successful in the position sought.  Id., 101:9-13 (no documents linking debt ratio and job success); 67:15-18 (no documents linking garnishments and financial stress); 69:6-16 (no documents linking "60-days overdue" criteria to financial stress).   Further, controller Rogoff testified that while Defendant "believes" that people with the inability to manage their personal finances are a risk to Defendant's assets, he could identify no documents supporting that belief.  Rogoff Dep 62:17-25; 63:1.  In fact, Rogoff could not even identify any documents to support Defendant's belief that a poor credit report reflects an applicant's failure to manage his or her personal finances.  Id., 62:13-16.

## DEFENDANT'S EXPERT PRODUCED NO ANALYSIS LINKING NEGATIVE CREDIT HISTORY TO FINANCIAL STRESS OR FRAUD

As Defendant's expert acknowledged, Defendant's justification for relying on credit history information in the selection process is based on Defendant's assumptions: (1) that a credit report shows whether a person is under "financial stress;" and (2) that if a person is under "financial stress" that person is more likely to engage in fraud.  Aamodt Dep 108:20-22; 109:1-5; 109:20-22; 110:1-3.  However, Defendant's expert produced no analysis linking negative credit history derived from a credit report to "financial stress" and the expert produced no analysis linking negative credit history, or "financial stress," to the propensity to commit fraud.  Without such an analysis, Defendant cannot satisfy its affirmative defense.

Not only did Defendant's expert conduct no analysis linking Defendant's credit check criteria to financial stress and propensity to commit fraud, the expert admitted that he knows of no study supporting such a link.  Defendant's expert conceded that he knows of no empirical study showing that Defendant's bullet-point credit check criteria predict whether an applicant is under "financial stress" or is likely to engage in misconduct:

14

> Q.    With respect to the numerical portions of the five bullet points there at the top of page 5 of your report, total amounts, for example, totaling $2,000 or more, 60 days at least overdue, a thousand dollars charge-off within one year, aggregate of 2,500 within the five years, are you aware of any empirical studies supporting the use of those figures –
>
> A.    I'm not aware of a study –
>
> Q.    – as predictors of financial stress or misbehavior?
>
> A.    I'm not aware of any study that would support or refute that.

Aamodt Dep 144:13-22; 145:1-3.  Defendant's expert suggested that the lack of research on the validity of credit checks is "probably due to difficulty in conducting such a study."  Ex. 1 to Aamodt Dep., p. 3.  However, the expert cited no authority for that conclusion.  Id.  When asked in deposition to confirm that he had no authority for that conclusion, the expert testified that no such authority could exist because the conclusion is pure opinion.  Aamodt Dep 114:5-17 (emphasis added).

EEOC's expert, Dr. Kevin Murphy, agrees with Defendant's expert that no empirical proof demonstrates a link between negative information found in an applicant's credit report and the likelihood that the applicant will steal from Defendant or commit fraud.  Ex. 4 to Aamodt Dep (Murphy Report); Ex. 5 to Murphy Dep (Murphy Supplemental Report), p. 2 ("As Dr. Aamodt notes, he is 'not aware of any research that would support or refute the validity of credit checks in predicting financial fraud[.]'  I agree.  I know of no evidence supporting the validity of credit checks in predicting financial fraud or dishonest behavior in organizations.").

## LEGAL STANDARDS AND ARGUMENT

More than 40 years ago, the Supreme Court held that an employer cannot satisfy the "job related and business necessity" prong of its affirmative defense in a disparate impact case unless the employer shows that the challenged employment practice bears a substantial relationship to successful performance in the job at issue and is necessary to the employer's business.  Griggs v. Duke Power Co., 401 U.S. 424 (1971).  In Griggs, the Court held that even where an employer does

not discriminate intentionally, its use of procedures that disparately impact a protected group are unlawful unless justified by business necessity: "[Title VII] proscribes not only overt discrimination, but also practices that are fair in form, but discriminatory in operation." Id., at 431.    In Griggs, a power company began requiring applicants for certain jobs to have a high school diploma and pass the Wonderlic Test (a general intelligence test) and the Bennett Mechanical Comprehension Test. Id., at 428-431.   There was no evidence that the employer intended to discriminate; instead, the company tried to help employees obtain a high school degree by paying for two-thirds of the tuition cost.  Id. at 432.  But, notwithstanding its intentions, the employer imposed the testing and diploma selection criteria without meaningful study of their relationship, if any, to job performance.  Id., Instead, the employer began using the test based on its own "judgment" that requiring applicants to pass the test would "improve the overall quality of the work force."  Id.  As a result, the employer was could not, as a matter of law, prove that the testing and diploma selection criteria were job related and consistent with business necessity.  Id.  The Court rejected the employer's empirically unsupported reliance on diplomas and tests to measure intelligence, explaining that "broad and general testing devices" and "diplomas and degrees" should not be used as "fixed measures of capability."  Id., at 433.  Instead, the Court observed, "[h]istory is filled with examples of men and women who rendered effective performance without the conventional badges of accomplishment in terms of certificates, diplomas, or degrees."  Id.  In its defense, the employer argued that the tests were lawful because they were professionally developed and not designed to discriminate because of race.  Id.  The Court rejected this defense, citing the EEOC's Guidelines on selection procedures first issued in 1970.  Id.  As support for its reliance on the Guidelines, the Court reasoned not only that they represent the EEOC's administrative interpretation of Title VII, but also that Title VII and its legislative history support that interpretation which "affords good reason to treat the guidelines as expressing the will of Congress."  Id., at 433-434.  The Court set the bar high for justifying the use of

an employment practice that has a disparate impact, holding that the employer must show that the employment practice "bears a demonstrable relationship to successful performance of the jobs for which it was used," has a "manifest relationship to the employment in question," and is "demonstrably a reasonable measure of job performance." Id., at 431-433. Further, the Court cautioned that an employer cannot use tests to measure *the person*, it may only use tests to measure *the person's ability to perform a specific job*: "What Congress commanded is that any tests used must measure the person for the job, and not the person in the abstract." Id., at 436.

In Albemarle Paper Co. v. Moody, 422 U.S. 405 (1975), the Court again addressed the definition of job relatedness and business necessity. Applying Griggs, the Court rejected the employer's attempt to satisfy its affirmative defense because the employer failed to prove that the challenged practice predicted the likelihood that employees would succeed in the jobs at issue. In Albemarle Paper, a paper production plant required applicants for certain positions to have high school diplomas and pass two tests: the Wonderlic Test (the same test used in Griggs) and the Beta Examination, used to measure nonverbal intelligence. Id., at 427. The employer's justification for using the tests was that verbal intelligence had become necessary as the plant transitioned to an "exceedingly more complex [] operation." Id., at 429, n. 24. When questioned about validation, the employer testified that it presumed the Wonderlic Test "had more validation studies behind it" than other available verbal intelligence tests. Id. The employer did not try to establish a link between the tests, the specific jobs at issue, and the employer's own workforce (referenced in the opinion as "local validation") because, the employer argued, such a study was too expensive and it was unlikely that the employer's workforce would cooperate in such a study. Id. Rather than conducting a study to determine what Wonderlic Test scores, if any, related to success in the jobs at issue, the employer did not attempt to validate the test for job relatedness; instead, it simply adopted the national "norm" score typically used for the Wonderlic Test as the cut-off score for its applicants. Id., at 429.

17

However, after the Court issued its opinion in <u>Griggs</u>, and four months before trial, the employer in <u>Albemarle</u> hired an industrial psychologist to validate the tests – or establish a link between the tests and success in the jobs at issue.  <u>Id.</u>, at 429.  The expert recommended a "concurrent validation" study which the plant officials conducted without the expert's supervision.  <u>Id.</u>  The employer provided the results to the expert and he conducted a statistical analysis of the results.  <u>Id.</u>  The study dealt with ten job groupings selected near the top of lines of progression within the skilled job set.  <u>Id.</u>, at 429-430.  No attempt was made to analyze jobs in terms of particular skill sets they required.  <u>Id.</u>  Nearly all of the employees (only four of whom were African American) participated in the study.  <u>Id.</u>, at 430.  In the study, the plant's current employees took the test.  <u>Id.</u>  Additionally, their supervisors – who did not know their test scores – ranked their subordinates' abilities (but not in the specific jobs they held), as compared to one another.  <u>Id.</u>  The study then compared each employee's test scores with the "ranking" that his supervisor had given him.  <u>Id.</u>  For each job grouping, the expert computed the statistical correlation between the test scores and an average of the supervisors' rankings and found a statistically significant relationship.  <u>Id.</u>  Accordingly, the trial judge concluded that the employer had conducted "validation studies" and had proven that the tests were "job related."  <u>Id.</u>  The appellate court, and the Supreme Court, disagreed.  <u>Id.</u>

In rejecting the employer's validation study, the Supreme Court held in <u>Albemarle</u> that the attempt to correlate the test scores to success in the jobs at issue was deficient because it did not satisfy the EEOC's Guidelines on selection procedures (now known as UGESP).  <u>Id.</u>, at 430-431.  The Court relied heavily on the Guidelines and held they were entitled to "great deference" because it concluded that the Guidelines mirrored the Court's holding in <u>Griggs</u>: "[t]he message of these Guidelines *is the same as* that of the <u>Griggs</u> case."  <u>Id.</u>, emphasis added.  Treating the Guidelines as a more detailed illustration of the <u>Griggs</u> standard, the Court articulated the following standard for proving "job relatedness:"

> [D]iscriminatory tests are impermissible unless shown, by professionally acceptable methods, to be "predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated."

Id., quoting 29 C.F.R. §1607.4(c).  The Court then measured the employer's validation study against the Guidelines and concluded that the study was "defective" because it did not establish that the Beta Examination correlated to success in *all of the jobs* for which it was used.  Id., at 431-432.  While the study showed correlations with some of the jobs, the employer could not rely on that correlation to validate the test as to other jobs unless it proved that "no significant difference" existed between the two sets of jobs.  Id., citing 29 C.F.R. §1607.4(c)(2).  Further, the study involved no job analysis – that is, "no analysis of the attributes of, or the particular skills needed in, the studied job groups."  Id. Additionally, the Court found that the study was defective because its use of supervisor rankings was too subjective, "vague and fatally open to divergent interpretations."  Id., at 433.  Again, the Court relied on the Guidelines as authority permitting the use of supervisory rankings in test validation but only with "far more care" than the plant employed.  Id., at 432, n. 30 (noting that the Guidelines compel use of criteria that represent "major critical work behaviors as revealed by careful job analyses" and that supervisor rankings must be "examined to insure freedom from factors which would unfairly depress the scores of minority groups.").  Importantly, the Court concluded that the criteria measured by the supervisors were vague, disparate, and unstable:

> There is no way of knowing precisely what criteria of job performance the supervisors were   considering, whether each of the supervisors was considering the same criteria or whether, indeed, any of the supervisors actually applied a focused and stable body of criteria of any kind.  There is, in short, simply no way to determine whether the criteria actually considered   were sufficiently related to the Company's legitimate interest in job-specific ability to justify a testing system with a racially discriminatory impact.

Id., at 433.  Finally, the Court held that the employer's validation study was insufficient to prove job relatedness because it failed to include enough minority participants, as required by the Guidelines. Id., at 434-435.

The Court next addressed the standard in Dothard v. Rawlinson, 433 U.S. 321 (1977), where it rejected the employer's argument that height and weight requirements predict an applicant's strength and, therefore, are necessary to the selection of prison guards.  Id., at 331-32.  In Dothard, the plaintiff applied for a prison guard job, but was rejected based on a state statute requiring prison guards to weigh at least 120 pounds.  Id., at 325.  The statute also required guards to be at least 5 feet 2 inches tall.  Id.  The plaintiff sued, alleging that the employer's use of the height and weight selection criteria violated Title VII because it had a disparate impact on women.  Id.  In defense of the height and weight criteria, the employer argued that applicants who satisfy the criteria are stronger and, therefore, make better prison guards.  Id.  Although, to some audiences, that justification may seem reasonable and uncontroversial, the Court demanded more than a reasonable justification. Instead, the Court held that the employer could not justify the selection criteria because it "produced no evidence correlating the height and weight requirements with the requisite amount of strength thought essential to good job performance."  Id., at 331.  Further, the Court held that the employer's path to justifying the selection criteria lay in adopting and validating a test that actually measures strength – not characteristics that the employer simply assumes are associated with strength: "If the job-related quality that [the employers] identify is *bona fide*, their purpose could be achieved by adopting and validating a test for applicants that measures strength directly.  Such a test, fairly administered, would fully satisfy the standards of Title VII, because it would be one that "measure[s] the person for the job, and not the person in the abstract."  Id., at 332.  But the employer failed to adopt any criteria that "even approach[ed]" a measurement of strength, as opposed to something the employer simply assumed is a badge of strength.  Id.

20

More than ten years later, in Wards Cove Packing Co., Inc. v. Antonio, 490 U.S. 642 (1989), the Court deviated from the Griggs standard and adopted a relaxed test for proving job relatedness and business necessity. In Wards Cove, the Court held that the touchstone of the job relatedness and business necessity inquiry is merely a "reasoned review of the employer's justification for his use of the challenged practice" and that while "mere insubstantial justification" does not suffice, there is no requirement that the challenged practice be "essential" or "indispensable" to the employer's business in order to prove the affirmative defense. Id., at 659. The Court rejected the Griggs standard, in part, because such a showing may be too difficult for employers to satisfy. Id. In his dissent, Justice Stevens vigorously opposed the majority's departure from the settled law established in Griggs, Albemarle, and Dothard. Id., at 664. The dissent concluded that the majority had no basis for rejecting the "elementary and eminently fair rules" set forth in Griggs. Id., at 679.

In response to Wards Cove, Congress enacted the Civil Rights Act of 1991 and, in so doing, codified the pre-Wards Cove standard. The Act explicitly provides that the employer bears the burden of proving that a selection criterion is "job related for the position and consistent with business necessity." 42 U.S.C. §2000e-2(k)(1)(A)(i). Further, the Act provides that among its purposes was "to codify the concepts of 'business necessity' and 'job related' enunciated by the Supreme Court in Griggs v. Duke Power Co., 401 U.S. 424 (1971), and in the other Supreme Court decisions prior to Wards Cove Packing Co. v. Antonio, 490 U.S. 642 (1989);" Pub. L. No. 102-166 3(1-4), 105 Stat. 1071.

More than a dozen years ago the Sixth Circuit held that, consistent with the 1991 CRA and application of the Griggs standard, an employer must satisfy the job relatedness and business necessity affirmative defense by validating its selection criterion using empirical proof, not by production of mere "causal reports," "anecdotal accounts," or other non-empirical analysis. Williams v. Ford Motor Company, 187 F.3d 533 (6th Cir. 1999). As the Sixth Circuit held in Williams,

> [T]o prove a selection procedure is job-related, the employer must show "by professionally acceptable methods, [that the test is] predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated." … In order to "assist employers … to comply with requirements of Federal law prohibiting employment practices which discriminate on grounds of race, color, religion, sex, and  national origin [and] to provide a framework for determining the proper use of tests and other selection procedures," … Equal Employment Opportunity Commission ("EEOC") developed the Uniform Guidelines, 29 C.F.R. §1607.1-.16, a set of standards for establishing the validity of these tests and procedures.  A test which is shown to have an adverse impact on hiring of members of any race or ethnic group is deemed "discriminatory" unless it is "validated" in accordance with these guidelines.

Id., at 539.  Additionally, in Williams the Sixth Circuit held that to comply with EEOC's Guidelines, "all types of validation studies must conform to several technical requirements." Id., at 540.  Further, the Court held that the Guidelines establish the *minimum* standards for validation.  Id.  The Court explicitly rejected the idea that an employer may rely on non-empirical proof:

> The guidelines specifically state that "under no circumstances will the general reputation of a test … its author … or causal reports of it's [sic] validity be accepted in lieu of evidence of validity."  Specifically ruled out are […] nonempirical or anecdotal accounts of selection practices or selection outcomes.  29 C.F.R. §1607.9(A).

Id., at 540-41.  While the employer in Williams satisfied the affirmative defense, it did so only after conducting extensive job analyses to identify the knowledge, skill, and ability requirements of hourly production jobs, and after developing predictive tests that measured skills that were appropriately rated in the analyses as important.  Id.  Moreover, the Court held that the employer's content-validity studies were not enough to justify its tests; the employer also had to conduct criterion validity studies.

Id.  Particularly where the employer uses a selection procedure that purports to measure "intelligence, aptitude, personality, commonsense, judgment, leadership, and spatial ability," it must show that the procedure is valid beyond mere content validity.  Id., at 545.  In Williams, the Court held that the employer demonstrated criterion validity because it proved "that the selection procedure is predictive of or significantly correlated with important elements of job performance."  Id., at 547.  See also Gonzales v. Galvin, 151 F.3d 526, n. 9 (6th Cir. 1998) (studies confirming that a selection procedure

is a valid predictor of workplace behavior "specifically require documentary evidence" and "casual reports of validity are not acceptable in lieu of evidence of validity[.]").

Similarly, in Isabel v. City of Memphis, the Sixth Circuit held that an employer has to satisfy the Griggs standard to justify using a test that has disparate impact.  Isabel v. City of Memphis, 404 F.3d 404, 413 (6th Cir. 2005).  In City of Memphis, the plaintiff challenged the employer's use of a written test and cut-off score to select police officers.  Id.  The Court held that the employer did not meet its burden to prove the affirmative defense because it did not show that the test was job related and did not even attempt to validate the cut-off score.  Id.  Specifically, the employer produced no proof that the cut-off score it selected actually measured minimal qualifications for the job.  Id.  Because the employer could not prove that the test was "predictive or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are evaluated[,]" the employer could not satisfy the affirmative defense.  Id., at 413, quoting Williams v. Ford Motor Co., 187 F.3d 533, 538-43 (6th Cir. 1999).

While there is no dispute that Griggs applies equally to pencil-paper tests and any other employment practice[8] that has a disparate impact, the Sixth Circuit has applied Griggs to employment screens other than pencil-paper tests, including some with inherently subjective elements.  For example, in Harless v. Duck, 619 F.2d 611, 616-617 (6th Cir. 1980), the Court held that a structured oral interview was not valid pursuant to Griggs, in part, because the "grading" was subject to a host of errors resulting from the lack of standardized conditions, rater bias, and the lack of criteria used to judge the correctness of answers.  Id.  In United States v. City of Warren, 138 F.3d 1083, 1091-92

---

[8]     None of the Supreme Court's controlling precedent articulating the Griggs standard is limited to application in pencil-paper tests.  Both Griggs and Albemarle involved the use, in part, of a high school diploma employment requirement – not merely the Wonderlic or other pencil-paper test.  Similarly, Dothard involved the use of a height and weight requirement, not a pencil-paper test.  Additionally, Griggs made clear that where "employment *practices,*" not "tests," have a disparate impact the employer must justify their use by proof of the affirmative defense.  When Congress enacted the CRA in 1991 it made clear that any "employment practice" that has impact must be justified by job relatedness and business necessity.  42 U.S.C. §2000e-2(k)(1)(A)(i).

(6th Cir. 1998), the Court held that <u>Griggs</u> applies to the analysis of an employer's recruiting practice alleged to have disparate impact, although the Court never reached that analysis because it granted judgment to the employer based on the plaintiff's failure to establish impact.  Similarly, the Court acknowledged in <u>Balogh v. City of Toledo</u>, 849 F.2d 608 (6th Cir. 1988) that a disparate impact claim may be raised to challenge an employer's use of background investigation scores as a selection criterion, although the Court did not reach the <u>Griggs</u> analysis.  <u>See also</u> <u>Isabel v. City of Memphis</u>, 404 F.3d 404, 413 (6th Cir. 2005) (<u>Griggs</u> applied to employer's use of cut-off score, not just written test).

## DEFENDANT'S EXPERT PRODUCED NO ANALYSIS LINKING CREDIT HISTORY AND FRAUD, NO JOB ANALYSES, AND NO VALIDATION STUDIES

Presumably because the controllers and Dervin uniformly testified that their reviews were based solely on "judgment" defined by nothing quantifiable, no documented standards, and no identifiable criteria, Defendant's expert made no attempt to test whether the "method" the controllers used predicts whether someone is, (1) under financial stress; and (2) if so, whether such distress is likely to result in commission of fraud.  Here, all three credit raters testified that they relied on no identifiable element of a credit report, no identifiable degree of indebtedness, no identifiable delinquent item, and no identifiable past due item.  Instead, they insisted that they looked at the entire report, "holistically," using their individual judgment of what constitutes "poor credit" and what makes someone a "high risk."  In effect, this testimony precludes Defendant's expert – or any other scientist – from performing a competent empirical analysis to show that the credit history information Defendant uses predicts whether an applicant will commit fraud if hired for the job at issue.

Defendant's expert readily admits that he knows of no empirical proof that Defendant's use of credit checks predicts whether an applicant will engage in fraud.  Aamodt Dep 144:13-22; 145:1-3.  Instead, Defendant's expert argues that *a different legal standard* should be applied to the question of

24

whether use of credit history is job related and consistent with business necessity.  Id., 114:18-22; 115:1-7.  Specifically, the expert argues that a "logical approach," not empirical proof, should be used to demonstrate the job relatedness and business necessity of credit checks.  Id.  The expert conceded that the "logical approach," as described in his report, has not been accepted as a professional standard for validation of a selection process.  Id., 152:1-22; 153:1-12.  The expert could not identify any literature, studies, or other writings that advocate or accept the use of a "logical approach" to justify the use of credit checks as a selection criterion.  Id., 116:3-6; 18-22.  The expert acknowledged that his "logical approach" standard cannot be found in empirical literature.  Id., 116:16-17 ("I think it's something that people talk about, but I don't think it would be something that you would see in empirical literature.").  As Griggs, Albemarle, Dothard, the 1991 CRA's codification of the pre-Wards Cove standard, and Sixth Circuit precedent make clear, an employer cannot justify the use of an employment practice that has disparate impact using a "logical approach." As the Sixth Circuit held in Williams, the employer must produce empirical proof – not "causal reports" or "nonempirical accounts."  The expert's insistence that Defendant's use of credit history should be measured by a new standard – the "logical approach" – is completely inconsistent with Supreme Court precedent and 42 U.S.C. §2000e-2(k) itself.   As a matter of law, Defendant's cannot satisfy its affirmative defense.

In addition to advocating for the use of a "logical approach" as opposed to empirical proof, Defendant's expert attempted to "investigate the job relatedness and business necessity of [Defendant's] credit check policy" by comparing it to the EEOC's use of credit history.  Ex. 1 to Aamodt Dep, p. 4.  The expert's "attempt to investigate" job relatedness and business necessity by comparing Defendant's use of credit history to the federal government's use of credit history is fatally flawed.  As explained below, EEOC does not use credit history for the same purpose as Defendant and its procedure is completely different than Defendant's procedure.  Additionally, even

if the parties used credit history for the same purpose – which they do not – EEOC's use of credit history could not possibly support Defendant's affirmative defense because there is no evidence that it has been validated. Defendant's expert readily admitted that he does not know whether there is any empirical proof supporting the EEOC's use of credit history information. Aamodt Dep, 113:1-19. The expert does not know whether the government's use of credit history, as applied by EEOC, has been validated. Id., 122:20-22; 123:1-4.[9]

Defendant simply points to the EEOC's use of credit history information and claims – if EEOC does it, then so can we.[10] However, the federal government enjoys no immunity from disparate impact liability. Harrison v. Lewis, 559 F.Supp. 943, 949, n. 6 (D.D.C. 1983) ("The conclusion that government selection systems are not immune from challenge under a disparate impact standard is supported by the legislative history of the 1972 amendments to Title VII, which extended coverage to federal employees."). Although EEOC's use of credit history could not possibly have disparate impact, since EEOC has not unfavorably adjudicated employees based on their debt issues, if the federal government uses a selection criterion that has disparate impact and fails to satisfy its affirmative defense, then the government is liable under Title VII. Delgado v. Ashcroft, 2003 WL 24051558 (D.D.C. May 29, 2003) (in disparate impact case, FBI failed to establish job relatedness and business necessity regarding its adjudicative guidelines and suitability

---

[9]   Defendant's expert testified that he assumed EEOC's use of credit history had been validated because, if not, that would be "embarrassing" to EEOC. Aamodt Dep 127:1-8. Whether EEOC, OPM, or any other branch of the federal government is "embarrassed" by the lack of empirical proof validating any employer's use of credit history in the selection process is irrelevant. If a federal agency is embarrassed as a result of this litigation, or as a result of any other enforcement action necessary to remedy civil rights violations, so be it. EEOC's mission is to enforce civil rights laws and remedy violations, not to avoid embarrassment.

[10]   Defendant will likely argue that if EEOC's Guidelines on selection procedures are entitled to deference, then EEOC's internal practices must also be relevant to the legal analysis of Defendant's affirmative defense. But there is no record evidence that EEOC's OPM-mandated internal practices, like the Commission's Guidelines, reflect EEOC's official interpretation of Title VII. Indeed, the record evidence supports the opposition conclusion: that EEOC disagrees with the suggestion that financial history is linked to any job duty performed at EEOC – or anywhere else. Moreover, EEOC's Guidelines on selection procedures are entitled to deference not only because they constitute EEOC's interpretation of Title VII but also, as the Court held in Griggs, because they are consistent with Title VII and congressional intent.

determination process for selecting FBI agents).  <u>See also</u> <u>Lumpkin v. Brown</u>, 898 F.Supp. 1263, 1271-72 (N.D. Ill. 1995) (Department of Veterans Affairs liable for disparate impact age discrimination when it failed to prove the affirmative defense as to promotions process); <u>Segar v. Smith</u>, 738 F.2d 1249, 1288, n. 34 (D.C. Cir. 1984) (DEA failed to validate subjective judgment of agents' performance).

As evidence of how the EEOC uses credit history, the expert cited only two documents neither of which described how EEOC uses credit history.  First, the expert relied on EEOC's Enforcement Guidance on the Consideration of Arrest and Conviction Records (issued in 2012), which addresses only criminal history background checks, not credit checks.  Second, the expert relied on EEOC's Personnel Suitability and Security Program Handbook which merely provides an overview of OPM's mandated background check requirements.  <u>Id.</u>  The Handbook does not reflect any independent EEOC policy; it is an "extraction of federal regulations and presidential orders that direct agencies to comply with OPM's personnel security program."  <u>Id.</u>, 20:2-8.  Pursuant to federal regulations, EEOC was required create a Handbook reflecting OPM's mandates.  <u>Id.</u>, 143:9-14.  Surprisingly, the expert's report does not reference either of the two depositions that EEOC's 30(b)(6) designee gave (and which Defendant twice moved to compel) describing in detail EEOC's policies concerning credit history and EEOC's use of such information.  Indeed, it appears that Defendant's expert *never even read the EEOC's depositions describing its use of credit history*.  Ex. 1 to Aamodt Dep, p. 8 (listing Seelye deposition as the only transcript reviewed); Aamodt Dep 108:20-22; 109:108.

Even a cursory review of EEOC's deposition regarding its use of credit history shows that the parties use different procedures, review different information, and consider credit history for different purposes.  Unlike Defendant, EEOC does not consider credit or debt as an indicator that an employee is more likely to steal or otherwise pose a threat to government assets.  Mosley Dep 140:13-22;

141:1-14 ("Q.  And one of the ways you look at likelihood of theft is to understand whether the person has a high level of indebtedness, correct?  A. No."); 192:5-14.  EEOC does not consider an employee's failure satisfy his or her debts as an indication that the employee will be tempted to steal from EEOC to gain funds.  Id., 150:3-11.  In fact, EEOC does not use credit history information *to predict anything at all*.  Instead, EEOC reviews debt issues because its employees are required to pay their debts pursuant to 5 C.F.R. §2635.101.  Id., 112-113; 116-117.  The regulation, entitled "Basic obligation of public service," provides:

> (a) *Public service is a public trust*.  Each employee has a responsibility to the United States  Government and its citizens to place loyalty to the Constitution, laws and ethical principles above private gain.  To ensure that every citizen can have complete confidence in the integrity of the Federal Government, each employee shall respect and adhere to the principles of ethical   conduct set forth in this section, as well as the implementing standards contained in this part and in supplementing agency regulations.

> […]

> > (12)  Employees shall satisfy in good faith their obligations as citizens, including all just financial obligations, especially those – such as Federal, State, or local taxes – that are imposed by law.

5 C.F.R. §2635.101(a)(12).

EEOC does not view credit checks as necessary for judging the suitability of EEOC applicants or employees.  Id., 225:22; 226:1-3.  To the contrary, EEOC testified that an EEOC employee's credit history or debt background has nothing to do with the employee's effective performance.  Id., at 176:2-18; 177:1.  EEOC's designee testified that, to his knowledge, EEOC has not terminated an individual because of debt.  Id., 114:4-6; 190:4-18; 210:11-13.  Further, EEOC's designee has never adjudicated any applicant or employee unfavorably because of debt.  Id., 131:2-7.

Although EEOC must comply with OPM directives, EEOC has formally advised OPM that it should either eliminate or significantly restrict its inquiries about federal applicants' and employees' financial information.  In a letter to OPM dated March 8, 2011, EEOC recommended that OPM

significantly restrict, or eliminate, OPM's inquiries about financial information because EEOC is unaware of any link between financial information and purpose for which the federal government considers it.  EEOC Letter to OPM, 3/8/11, p. 3.

Notwithstanding EEOC's position that credit history has no bearing on an individual's suitability, OPM does conduct credit checks on some EEOC applicants and employees.  Mosley Dep 177:7-9; 226:4-11.  EEOC is required by 5 CFR §731 to comply with OPM's regulations concerning background investigations.  Id., 167:15-20.  In fact, EEOC's human resources and personnel security functions are mandated by OPM regulations.  Id., 171:4-6.  OPM requires EEOC to gather information from employees by asking the employees to fill out OPM Standard Forms (SFs).  Some of the OPM SFs ask employees to provide financial information.  After gathering that information for OPM (as required), EEOC sends the information to OPM and OPM conducts a credit check and background investigation and analyzes the financial information provided by the applicants.

After OPM conducts the background investigation, EEOC receives a report of investigation that has been analyzed and assessed by OPM's adjudication division.  Mosley Dep 43:1-3.  OPM also provides EEOC with an abbreviated credit report.  Id., 54:21-22; 55:1-2.  While Defendant's credit raters Rogoff, Corser, and Dervin consider nothing more than the four corners of the applicant's credit report, EEOC considers entirely different information.  Further, EEOC's procedure focuses almost exclusively on pursuing, gathering, and highlighting mitigating information and then conducts an individual review of that mitigating information.  If OPM returns its background investigation and OPM has flagged what it believes are debt issues, EEOC immediately begins collecting mitigating information.  Id., 181:11-22; 182:1-2.  If OPM identifies debt issues in its report, EEOC provides due process by sending the employee a letter specifically identifying the accounts that are at issue (recording the information from OPM's abbreviated credit report) and giving the employee an opportunity to mitigate the circumstances and to explain what steps are being taken to resolve the

issues.  Id., 79:9-17; 80:1-11; 93:19-22; 94:1-3; 209:6-10.  EEOC has discretion to create its own due

process procedures and does so to provide employees with an opportunity to explain and work on any

debt issues identified by OPM.  Id., 199:21-22; 200:1-2.  If employees do not respond to EEOC's

initial due process invitation, EEOC engages them personally and discusses their ethical obligations

as federal employees.  Id., 117:9-19.  EEOC advises the individual to get a free copy of his or her

credit report to identify any errors or updates and explains what EEOC needs to make a conclusive,

favorable background decision.  Id., 115:11-22.  EEOC offers applicants and employees the

opportunity to mitigate the circumstances, to explain how they got in a problematic debt situation,

and to develop a plan to rectify it.  Id., 148:1-5.  EEOC gives the employee an opportunity to rectify

the situation no matter how bad their credit is.  Id., 149:9-13.  Although the employee is asked to

show that he or she has resolved the debt issues, "resolved" simply means that the employee is

*working on* resolving the debt issues or trying to get the situation rectified.  Id., 151:20-22; 152:1-9;

152:10-16.  Once EEOC is satisfied with the information provided, EEOC favorably adjudicates the

background investigation notwithstanding the debt issues.  Id., 132:4-9.  EEOC does not follow up to

confirm that the employee did, in fact, mitigate the debt issues.  Id., 132:7-18; 150:13-17; 191:18-22;

192:1-4.  Further, EEOC does not initiate credit checks on employees who have been asked to resolve

debt issues (or on any other employees).  Id., 32:10-18.  EEOC allows employees to continue to work

for the agency as long as they are honest about their bad debt.  Id., 87:14-17.  As long as the

individual is willing to participate in the process and rectify the situation, the individual will remain

employed by EEOC and will not be unfavorably adjudicated for debt issues. Id., 149:19-22; 150:1-2.

     Defendant's effort to justify its own use of credit history by pointing to the EEOC's OPM-

mandated background checks is meritless.  Either Defendant must prove that its use of credit history

predicts the propensity to commit fraud or it must admit that no empirical proof establishes such a

link.  Federal law demands nothing less.

Respectfully submitted,


/s/ M. Kate Boehringer
M. KATE BOEHRINGER
Supervisory Trial Attorney
EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION
Baltimore Field Office
10 S. Howard Street, Third Floor
Baltimore, MD 21201
Tel: 410-209-2737
Fax: 410-962-4270

JEFFREY STERN
Senior Trial Attorney
EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION
Cleveland Field Office

## CERTIFICATE OF SERVICE

I hereby certify that I filed EEOC's Motion for Partial Summary Judgment on November 30, 2012 using the electronic filing system which will provide a copy to counsel of record.


/s/ M. Kate Boehringer
M. KATE BOEHRINGER